# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JANET JOYNER and<br>CONSTANCE LYNN BLACKMON,<br><br>Plaintiffs,<br><br>v.<br><br>FORSYTH COUNTY, NORTH<br>CAROLINA,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:07CV243 |

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the Court on cross-motions for summary judgment filed by the parties. (Docket Nos. 63, 79.) These motions have been fully briefed, and the Court held oral argument on October 14, 2009. For the reasons stated herein, the Court concludes that Plaintiffs' motion should be granted and that Defendant's motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

This is an action brought pursuant to 42 U.S.C. § 1983. (Docket No. 38, Amended Complaint ("Am. Compl.") at 1.) Plaintiffs Janet Joyner and Constance Lynn Blackmon allege that Defendant Forsyth County is violating their First and Fourteenth Amendment rights under the United States Constitution by sponsoring and allowing sectarian prayer at its meetings of the Forsyth County Board of Commissioners. (*Id*. at 12-14 (First Claim for Relief).) Plaintiffs allege in their Second Claim for Relief that these sectarian prayers violate

their rights under Article I, sections 13 and 19 of the Constitution of North Carolina. (*Id*. at 14.) Plaintiffs request relief in the form of a declaratory judgment, an injunction prohibiting Defendant from allowing sectarian prayers at Board meetings, recovery of nominal damages, and reasonable expenses and attorney's fees pursuant to 42 U.S.C. § 1988. (*Id*. at 15.)

Defendant Forsyth County exercises its power as a county through its elected Board of Commissioners ("the Board"). (Am. Compl. ¶ 7; Docket No. 43, Def.'s Answer ("Answer") ¶ 8.) The Board generally meets twice per month in public meetings and also conducts four "briefing" meetings each month which are also open to the public. (Am. Compl. ¶ 8; Answer ¶ 9.) The twice-monthly Board meetings (other than the "briefing" meetings) regularly are accompanied by an opening invocation delivered by local clergy. (Am. Compl. ¶ 9; Answer ¶ 10.) These invocations are the focus of this case. Plaintiffs commenced this action on March 30, 2007, and on May 14, 2007, the Board adopted a written policy ("the Policy") to govern its invocation practice. (Am. Compl. ¶ 11; Answer ¶ 12.) The Board allowed invocations prior to this time pursuant to an unwritten policy.[1] (Am. Compl. ¶ 13; Answer ¶ 14.)

---

[1] Plaintiffs agreed during oral argument that for the purpose of this Court's ruling their claims are limited to the Board's practice after the written policy became effective. (Docket No. 94, Transcript of Proceedings, at 6-7.) This Court therefore focuses on the Board's practice following the adoption of the Policy. The record includes recordings of prayers delivered under the Policy through December 2008. (*See* Docket No. 64, Pls.' Br. in Supp. of Mot. for Summ. J. ("Pls.' Br.") at 3.) Recordings of prayers delivered at Board meetings held prior to this time period are also a part of the record.

On May 14, 2007, the Board adopted by majority vote the Policy which is entitled "Resolution Adopting a Policy Regarding Opening Invocations Before Meetings of the Forsyth County Board of Commissioners." (Docket No. 65, Appendix to Pls.' Mot. for Summ. J. ("Pls.' Appendix"), Ex. 1.) The "Resolution" is three pages in length and, in the context of "whereas" clauses, sets out selected quotations from the Supreme Court and the Fourth Circuit Court of Appeals regarding legislative prayer. (*Id*.)

The "Resolution" also references and adopts the "attached written policy consisting of three pages regarding opening invocations before meetings of the Board." (*Id*.) In the attached three pages, the Board states that "it is the policy of the Board to allow for an invocation or prayer to be offered before its meetings for the benefit of the Board" to solemnize the proceedings. (*Id*. (¶ 1 of "Policy Regarding Opening Invocations Before Meetings of the Forsyth County Board of Commissioners").) The prayer is not to be listed as an agenda item for the meeting and no person in attendance "shall be required to participate in any prayer that is offered." (*Id*. ¶ 3.) The prayer is delivered "by an eligible member of the clergy/religious leader in Forsyth County." (*Id*. ¶ 4.) The Policy sets out the procedure by which the invocational speaker is selected. The Clerk to the Board compiles and maintains a database (the "Congregations List") of the religious congregations with an established presence in the local community of Forsyth County. (*Id*.) The Congregations List is compiled using the annual Yellow Pages phone books, research from the Internet, and consultation with local chambers of commerce. (*Id*.) All such religious congregations are

-3-

eligible to be included and any such congregation may confirm its inclusion by specific written request to the Clerk. (*Id*.)

The Policy continues by providing that the Congregations List is to be updated by the Clerk in November of each calendar year. (*Id*.) The Clerk mails an invitation letter addressed to the "religious leader" of each congregation listed on the Congregations List. (*Id*.) The Policy sets out the language used in this letter. (*Id*.) In this letter, the religious leader is advised that the leader is eligible to voluntarily offer a prayer before the beginning of an upcoming meeting of the Board. (*Id*.) The religious leader is asked to send a written reply to the Clerk. (*Id*.) Those responding are "scheduled on a first-come, first-serve basis." (*Id*.)

The Board's invitation letter advises the religious leader of the regular meeting times of the Board. (*Id*.) It also advises that the religious leader may offer an invocation "according to the dictates of [the leader's] own conscience." (*Id*.) The letter further states that the Board "requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker" to maintain a "spirit of respect and ecumenism." (*Id*.) The letter is signed by the Clerk to the Board. (*Id*.)

The invocational speakers do not receive compensation for their services. (*Id*. ¶ 5.) The Policy directs the Clerk to make every reasonable effort to ensure that a variety of

-4-

Case 1:07-cv-00243-JAB-LPA   Document 95   Filed 11/09/09   Page 4 of 19

eligible speakers are included for the Board meetings, and no speaker is to be scheduled for consecutive meetings or at more than two meetings in any calendar year. (*Id.* ¶ 6.)

The Policy states that neither the Board nor the Clerk "shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker." (*Id.* ¶ 7.) The Chair of the Board "shall introduce the invocational speaker" and "invite only those who wish to do so to stand for" the invocation and Pledge of Allegiance. (*Id.* ¶ 8.) This is to be done "[s]hortly before the opening gavel that officially begins the meeting and the agenda/business of the public." (*Id.*) The Policy states that it is not intended to affiliate the Board with, nor express a preference for, any faith or religious denomination. (*Id.* ¶ 9.) Rather, the Policy states that it is intended to respect "the diversity of religious denominations and faiths" of Forsyth County. (*Id.*)

In practice since the adoption of the Policy, it is undisputed that at Board meetings the invocation speaker frequently stands at the podium and speaks into the microphone. (Am. Compl. ¶ 29; Answer ¶ 30.) The audio recordings of Board meetings made by the County regularly include the opening invocation. (*See* 2 CD's labeled Forsyth County Board of Commissioners, Meeting Recordings, 2006, 2007, and 2008 ("Meeting Recordings").) Following the invocation, the normal practice is that the Pledge of Allegiance is recited by those present, and the meeting is gaveled to order. (*Id.*) The Board chairperson normally begins the invocation by stating, "Let us stand" or "Please stand" for the invocation and

-5-

Pledge of Allegiance. (*Id*.) At other times, the chairperson uses language such as, "Let those who are willing stand." (*Id*.)

Plaintiffs are citizens and residents of Forsyth County. (Docket No. 65, Ex. 2 at 6; Ex. 7 at 7.) Both Plaintiffs attended the December 17, 2007 Board meeting. (*Id.,* Ex. 2 at 98-99; Ex. 7 at 48.) Plaintiff Joyner was interested in hearing the Board's discussion and decision on Item 1A on the Agenda and intended to speak on the matter during the Public Hearing portion of the meeting. (*Id*., Ex. 7 at 70.) Reverend Robert Hutchens delivered the invocation at that meeting. (*Id*.) The entire invocation given at the December 17, 2007 meeting is transcribed in the record. (Pls.' Br. at 12 (which the Court finds to be an accurate transcription except for a few inconsequential variances from the county audio recording); Docket No. 87, Appendix to Def.'s Br. in Opp'n to Pls.' Mot. for Summ. J., Ex. D at 4-5.) In that invocation, Reverend Hutchens describes himself as a "minister of the Gospel of the Lord Jesus Christ" and makes references to the "New Testament," "Your Son," "the Cross of Calvary," "that Virgin Birth," "the Bible," and closes the prayer with the phrase "For we do make this prayer in Your Son Jesus' name, Amen." (*Id*.)

Plaintiffs testified in their depositions and affidavits about the December 17, 2007 prayer. Plaintiff Blackmon states that she felt coerced to stand for the prayer by the Board chairperson. (Docket No. 88, Appendix to Pls.' Br. in Opp'n to Def.'s Mot. for Summ. J., Ex. 24 at 99.) She felt alienated as a county resident and less inclined to attend future meetings. (*Id*. at 100-01.) Plaintiff Blackmon further states in her affidavit that she felt

unwelcome as a non-Christian and "coerced by [her] government into endorsing a Christian prayer." (Am. Compl., Ex. H, Aff. of Constance Lynn Blackmon at 2.)

Plaintiff Joyner testified that she was "shocked" at the prayer given by Reverend Hutchens and his thanking the Board for "having stood up for his right to pray to the Lord Jesus as he says the New Testament requires." (Docket No. 88, Ex. 29 at 70.) She felt compelled to bow her head during prayer. (*Id*. at 70-71.) Plaintiff Joyner felt that the prayer was "worse than anything" she had ever heard at the meetings "in terms of its offensiveness." (*Id*. at 71.) She states in her affidavit that she felt coerced "into endorsing a Christian prayer." (Am. Compl., Ex. I, Aff. of Janet Joyner, ¶ 9.) Plaintiff Joyner decided not to speak on the agenda item she planned to speak on in part due to her fear of harming the agenda item "because of this issue about the prayer." (Docket No. 88, Ex. 29 at 71.)

The record evidence shows that the prayers delivered at Board meetings from May 29, 2007, through December 15, 2008, frequently contained at least one reference to Jesus, Jesus Christ, Christ, Savior, or the Trinity. (*See* Meeting Recordings.) Only seven of the thirty-three prayers recorded during this period did not contain such references. (*Id*.) Of these seven, the Board chairperson gave three of these prayers not containing such references. (*Id*. (Invocations on November 12, 2007, April 28, 2008, and May 12, 2008).) Not one of these thirty-three recorded prayers invoked a deity associated with any specific faith other than Christianity. (*Id*.)

-7-

# DISCUSSION

## A. Summary Judgment Standard

Summary judgment is appropriate only when no genuine issue of material fact exists. *Shealy v. Winston*, 929 F.2d 1009, 1011 (4th Cir. 1991). A genuine issue of fact exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A court considering a motion for summary judgment must view all facts and draw all reasonable inferences from the evidence before it in a light most favorable to the non-moving party. *Id.* at 255. The proponent of summary judgment "bears the initial burden of pointing to the absence of a genuine issue of material fact." *Temkin v. Frederick County Comm'rs,* 945 F.2d 716, 718 (4th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the movant carries this burden, then the burden "shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." *Id*. at 718-19 (citing *Anderson*, 477 U.S. at 247-48). A mere scintilla of evidence supporting the non-moving party's case is insufficient to defeat a motion for summary judgment. *See, e.g., Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994); *see also Anderson*, 477 U.S. at 248 (non-moving party may not rest upon mere allegations or denials.)

## B. Plaintiffs' Standing

Defendant attempts to reassert on summary judgment its arguments against Plaintiffs' standing made in its previously filed motion to dismiss by "defer[ring] to those pleadings"

without setting out argument in the summary judgment briefing. (Docket No. 86, Def.'s Br. in Opp'n to Pls.' Mot for Summ. J., at 16.) In addressing Defendant's motion to dismiss (Docket No. 45), Judge Russell A. Eliason ruled that the motion "while technically not denied, is hereby suspended, the brief stricken with permission to fold any arguments in support of the motion to dismiss into the summary judgment briefs." (Docket No. 58 at 1.) Judge Eliason ordered that "any arguments in support of [Defendant's motion] must be contained in the summary judgment briefing." (*Id*. at 2.) Judge Eliason advised the parties that the Court "will not be considering the briefs in support or responsive to the motion to dismiss." (*Id*. at 1.)

A litigant establishes standing by demonstrating a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury. *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007). By failing to include any argument against Plaintiffs' standing in the summary judgment briefs, Defendant has violated Judge Eliason's Order and has failed to properly support its argument. Plaintiffs' standing is therefore essentially unopposed, and the Court finds that based on the undisputed facts of this case and the relief sought, Plaintiffs have standing to bring this action. *See id.*; *Koenick v. Felton*, 190 F.3d 259, 263 (4th Cir. 1999) (litigant must allege direct injury to establish standing such as being subjected to unwelcome intrusion of religion); *see also Pelphrey v. Cobb County, Ga.*, 547 F.3d 1263, 1279-80 (11th Cir. 2008) (finding standing to challenge invocations at county planning

commission meetings because plaintiff had attended meetings at which invocations were given).

C. **Private vs. Government Speech**

Plaintiffs contend that the invocation prayers are government speech, and thus are subject to the limitations imposed by the Establishment Clause of the First Amendment made applicable to the States through the Fourteenth Amendment. In opposition, Defendant Forsyth County argues that the prayers are private speech and free of such constraints. (Pls.' Br. at 20-25; Docket No. 80, Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 27-29.) The Court concludes, however, that binding Fourth Circuit precedent presents a formidable obstacle for Defendant in its attempt to establish that legislative prayer is private speech. In *Turner v. City Council of Fredericksburg, Va.*, 534 F.3d 352, 355 (4th Cir. 2008), *cert. denied*, ___ U.S. ___, 129 S. Ct. 909 (2009), the court of appeals noted that the plaintiff had not "cited a single case in which a legislative prayer was treated as individual or private speech."

The Fourth Circuit has adopted a four-factor test for determining when speech may be attributed to the government. The relevant factors are: (1) the central purpose of the program in which the speech occurs; (2) the degree of editorial control exercised by the government over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government bears the "ultimate responsibility" for the content of the speech. *Turner*, 534 F.3d at 354.

-10-

Here, as in *Turner*, the central purpose of Board meetings is to conduct the business of the government. (*See id.*; Meeting Recordings.)² The Board's Policy prescribes that neither the Board nor its Clerk shall make prior inquiry into, review, or have involvement in the content of any prayer. (Docket No. 65, Ex. 1 ¶ 7.) Plaintiffs fail to show that Defendant has violated that provision and involved itself in the content of prayer delivered by local clergy. However, the three prayers delivered by the Board chairperson reflect some control by the Board over the content of the prayer. Moreover, when private individuals deliver the invocations, the Board's Clerk plays a central role in the process which results in the individuals' presence at the Board meetings. The Clerk compiles and maintains the list from which the speakers ultimately are drawn, mails the invitation letters to prospective speakers, and schedules the speakers to deliver the invocation at a particular Board meeting. (*Id.* ¶ 4.) The final factor also reflects the substantial role of government in the invocation prayers. In considering the "ultimate responsibility" for the content of the prayer, the Fourth Circuit in *Turner* acknowledged that the speakers "take some personal responsibility" for their prayers. *Turner*, 534 F.3d at 355. Yet, the court found that "given the focus of the prayers on government business at the opening of the Council's meetings," the prayers at issue were government speech. *Id.*

---

² Defendant maintains that the invocations in question are not a part of the Board meetings but take place before the meetings are called to order. The record shows, however, that this argument elevates form over substance. Indeed, the very title of the policy of the Board reads "Policy Regarding Opening Invocations Before Meetings of the Forsyth County Board of Commissioners." If the invocations do not "open" the meetings, what do they open?

-11-

Case 1:07-cv-00243-JAB-LPA   Document 95   Filed 11/09/09   Page 11 of 19

After considering these factors, the Court concludes that Defendant's invocation prayers are government speech. The central purpose of the program in which the invocations are given is the business of government. Government plays a substantial role in selecting the speakers and scheduling their appearances and a lesser role in the content of the prayers. Finally, the general focus of the prayers as shown by the undisputed record evidence is on the Board and government business. (*See* Meeting Recordings.) The Policy itself refers to the "tradition of solemnizing" the Board meetings "by allowing for an opening prayer before each meeting." (Docket No. 81, Appendix to Def.'s Br. in Supp. of Mot. for Summ. J., Ex. B at 2.) Accordingly, the invocation prayers are subject to the limitations of the Establishment Clause. *See Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 288 (4th Cir. 2005) (agreeing with district court that board invocations were government speech and that relevant to this issue were the facts that the purpose of the invocation was to solemnize the occasion and that the invocation was not intended for the exchange of views or other public discourse or for the exercise of one's religion).

D.  **Establishment Clause Analysis**

In deciding whether Defendant's invocation practice violates Plaintiffs' rights under the Establishment Clause, this Court is bound by precedent of the United States Supreme Court and the Fourth Circuit Court of Appeals. This is an important recognition in this

-12-

developing area of law, especially when other federal circuit courts may have differing standards for deciding such issues.³

In *Marsh v. Chambers*, 463 U.S. 783 (1983), the Supreme Court held that "non-sectarian legislative prayer generally does not violate the Establishment Clause." *Simpson*, 404 F.3d at 282. The Court in *Marsh* examined the practice of the Nebraska legislature of opening each session with a prayer by a chaplain paid with public funds. In *Marsh*, the Court stated the following:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Marsh*, 463 U.S. at 794-95.

In the present action, Defendant relies upon the above quoted language to argue that this Court should not consider the content of the prayers delivered as invocations at Board meetings because there is no evidence of a "trigger" justifying such consideration, in other words, the exploitation referred to in *Marsh*. (Docket No. 80, Def.'s Br., at 20 ("Absent exploitation, content is unimportant.").) In order to determine whether such an argument is

---

³ This Court therefore rejects Defendant's argument to follow the reasoning of cases from other circuits such as *Pelphrey,* 547 F.3d at 1263. This Court considers that *Pelphrey* is not consistent with Fourth Circuit cases to the extent that it declines to consider the content of legislative prayer to determine whether the prayer advances any one faith or belief.

-13-

well taken, this Court must turn to the Supreme Court and Fourth Circuit cases following *Marsh* that have examined this language.

In *County of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), the Supreme Court explained that *Marsh* "recognized that not even the 'unique history' of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief." *Id*. at 603 (internal citations omitted.) The *Allegheny* Court also found that the Establishment Clause means "at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions)." *Id*. at 605.

In *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292 (4th Cir. 2004), the Fourth Circuit held that the town council violated the Establishment Clause in opening council sessions with prayers that frequently contained references to Jesus Christ and, thus, advanced one religion over all others. *Id*. at 301-02. The court of appeals explained that *Allegheny* and *Marsh*, read together, teach that a legislative body may generally "invoke Divine guidance for itself before engaging in its public business," but cannot, consistent with the Establishment Clause, "'exploit' this prayer opportunity to 'affiliate' the Government with one specific faith or belief in preference to others." *Id*. at 298.

The *Wynne* court found that its consideration of the district court's factual finding – that the challenged prayers frequently invoked "Jesus," "Jesus Christ," "Christ," or "Savior," – did *not* constitute the "parsing" which the Supreme Court discouraged absent evidence of

-14-

exploitation. *Wynne*, 376 F.3d at 298-99 & n.4. The *Wynne* court construed *Allegheny* to have clarified that the prayer in *Marsh* was upheld only because the chaplain had removed all references to Christ. *Id*. at 299. Thus, the prayer did not violate the "nonsectarian maxim" that the Establishment Clause at least means that neither a state nor the federal government can prefer one religion over another. *Id*. Invocations that have the "effect of affiliating the government with any one specific faith or belief" do not "fall within" the category of legislative prayer discussed in *Marsh*. *Id*. (internal quotations omitted).

In *Simpson*, after determining that *Marsh* controlled the issue of the constitutionality of the invocation policy of the Chesterfield County Board of Supervisors, the Fourth Circuit immediately "address[ed] the prayers themselves" because "they are what the general public sees and hears." *Simpson*, 404 F.3d at 282. Importantly, the court considered the content of the prayers before concluding that the prayers did not proselytize or advance any one or disparage any other faith or belief. *Id*. at 284 (concluding that "the content of the invocations given at County Board meetings has not 'crossed the constitutional line.'"). The court is clear about the type of prayer that passes the *Marsh* test: "*Marsh* requires that a divine appeal be wide-ranging, tying its legitimacy to common religious ground." *Id*. at 287. Such prayer should "transcend[] denominational boundaries and appeal[] broadly to the aspirations of all citizens." *Id*. Prayers consistent with *Marsh* "highlight beliefs widely held." *Id*. (internal quotations omitted.) They also "evoke common and inclusive themes and forswear . . . the forbidding character of sectarian invocations." *Id*.

-15-

This Court is bound by *Wynne* and *Simpson*, and therefore the Court rejects Defendant's argument that the content of its prayer should not be examined unless the Court first determines that the Board's prayer opportunity has been exploited to proselytize, advance, or disparage any one faith or belief. If that were the rule in the Fourth Circuit, *Simpson* would never have considered the content of the prayer.[4] In addition, the *Wynne* court makes clear that recognizing frequent references to Christ in prayer is not the type of "parsing" to which *Marsh* refers. *Wynne*, 376 F.3d at 298 n.4.

The undisputed record shows that the prayers delivered at the outset of Board meetings from May 29, 2007 through December 15, 2008 referred to Jesus, Jesus Christ, Christ, or Savior with overwhelming frequency. (*See* Meeting Recordings.) No non-Christian deities are invoked. (*Id*.) These prayers as a whole cannot be considered non-sectarian or civil prayer. They display a preference for Christianity over other religions by the government. The frequent references to Jesus Christ cause the prayers to promote one religion over all others, *see Wynne*, 376 F.3d at 298-99, and thus the effect of these prayers is to affiliate the Board with a specific faith or belief. The record shows that Defendant's

---

[4] During oral argument, counsel for Defendant argued that exploitation of the prayer opportunity existed in *Simpson*, but not in the present case, because Chesterfield County "limited the pool of clergy participants or possible participants to only monotheistic traditions." (Docket No. 94 at 29.) However, the *Simpson* court found that Chesterfield County's policy did not proselytize or advance any one or disparage any other faith or belief. *Simpson*, 404 F.3d at 284. The Fourth Circuit therefore did not find that the limitation cited by Defendant's counsel constituted exploitation. Rather, the court considered the content of the prayer first and then concluded that there was no exploitation.

prayer does not "evoke common and inclusive themes and forswear . . . the forbidding character of sectarian invocations." *Simpson*, 404 F.3d at 287. Defendant's prayer does exactly the opposite. As exemplified by Plaintiffs' affidavits and deposition testimony, Defendant's prayer alienates those whose beliefs differ from Christian beliefs and divides citizens along religious lines. (Docket No. 88, Ex. 24 at 98-102; Ex. 29 at 69-71; Am. Compl., Exs. H, I.) Therefore, the Board's prayer, "part and parcel of the unitary policy under attack," *see Simpson*, 404 F.3d at 282, does not fall within the category of legislative prayer justified by the "unique history" discussed in *Marsh* and violates the Establishment Clause. *See Allegheny*, 492 U.S. at 603; *Wynne*, 376 F.3d at 297-99.

This Court recognizes, of course, that Defendant's policy does many things right. By way of example, as in *Simpson*, the Board's selection process for invocation speakers strives to include a wide variety of speakers from diverse religious faiths. However, a critical difference from *Simpson* is that the prayers given under Defendant's policy do not reflect this diversity.[5] *See Simpson*, 404 F.3d at 284 (Chesterfield County had variety of prayers delivered by clerics of multiple faiths and traditions.) Critically, it is the prayers themselves that the public "sees and hears," not the selection policy. *See id*. at 282. The prayers actually delivered under Forsyth County's Policy do not fit within the "genre of legislative

---

[5] The *Simpson* prayers were also non-sectarian. 404 F.3d at 279.

invocational prayer" that has become part of the fabric of our society. *Id*. quoting *Snyder v. Murray City Corp*., 159 F.3d 1227, 1233 (10th Cir. 1998) (en banc).

**E.     North Carolina Constitution**

Plaintiffs also raise a claim under the North Carolina Constitution. (Am. Compl. at 14.) Because the Court finds that Defendant's prayer violates the United States Constitution, there is no need to address this issue.

**F.     Relief**

Plaintiffs seek relief in the form of a declaratory judgment, an injunction prohibiting Defendant from allowing sectarian prayers at its Board meetings, nominal damages, and the payment of reasonable expenses and attorney's fees. (*Id*. at 15.) This Court should declare that the effect of Defendant's policy is to violate the Establishment Clause of the United States Constitution and allow the recovery of nominal damages and attorney's fees as part of the costs under 42 U.S.C. § 1988. The Court should enjoin the continuation of the Policy as it is now implemented.

**Conclusion**

For the foregoing reasons, **IT IS RECOMMENDED** that Plaintiffs' Motion for Summary Judgment (Docket No. 63) be granted as set out above and that Defendant's Motion for Summary Judgment (Docket No. 79) be denied.

This the  9th  day of November, 2009.

                              /s/ P. Trevor Sharp
                        United States Magistrate Judge