IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:07cv00243

JANET JOYNER and                    )
CONSTANCE LYNN BLACKMON,            )
                                    )
        Plaintiffs                  )
                                    )
                                    )        **DEFENDANT'S OBJECTIONS**
    v.                              )        **TO THE PROPOSED FINDINGS**
                                    )        **AND RECOMMENDATION OF**
FORSYTH COUNTY,                     )        **THE U.S. MAGISTRATE JUDGE**
NORTH CAROLINA                      )
                                    )
        Defendant                   )
                                    )
_____)

ATTORNEYS FOR DEFENDANTS

/s/ J. Michael Johnson
J. Michael Johnson
Senior Legal Counsel
Alliance Defense Fund
Lead Counsel for Defendant
P.O. Box 52954
Shreveport, Louisiana 71135
Phone: (318) 603-1435
Email: mjohnson@telladf.org
Licensed to practice in LA


David A. Cortman*
Senior Legal Counsel
Alliance Defense Fund
Counsel for Defendant
1000 Hurricane Shoals Rd. D-600
Lawrenceville, GA 30043
Phone: (770) 339-0774
Email: dcortman@telladf.org
Licensed to practice in FL and GA

Bryce D. Neier
Local NC Counsel
Allied Attorney with ADF
The Law Office of Bryce D. Neier
P.O. Box 87164
Fayetteville, NC 28304
Phone: (910) 423-5000
Email: bryceneier@aol.com
NC State Bar No. 19206

David Gibbs*
Barbara Weller*
The Gibbs Law Firm
Counsel for Defendant
5666 Seminole Blvd., Suite 2
Seminole, FL 33772
Phone: 727-399-8300
Email: dgibbs@gibbsfirm.com
 bweller@gibbsfirm.com
Gibbs licensed to practice in FL, ND,
MN, CO, TX, OH and Dist. of Columbia
Weller licensed to practice in FL

*By special appearance pursuant to LR 83.1(d)*

MAY IT PLEASE THE COURT:

Pursuant to Fed. R. Civ. P. 72(b), 6(a), and 6(e), Defendant, FORSYTH COUNTY, NORTH CAROLINA, respectfully presents these objections to the proposed findings and recommendation of the United States Magistrate Judge (Docket No. 95, hereinafter "Recommendation" and "Rec.").

## I. THE RECOMMENDATION FAILS TO ACKNOWLEDGE THAT PRIVATE SPEECH IS AT ISSUE.

Defendant respectfully objects to the Recommendation finding that this case involves government rather than private speech. While the Court cited *Turner v. City Council of City of Fredericksburg, Va.*, 534 F.3d 352, 354-55 (4th Cir. 2008), *cert. denied*, __U.S.__, 129 S.Ct. 909 (2009), and acknowledged "[t]he Fourth Circuit has adopted a four-factor test for determining when speech may be attributed to the government," (Rec. at 10), the Court relied on a flawed application of that test here. Moreover, the Court's reliance on *Turner* was misplaced, because it is easily distinguished from the case at bar.

### A. The four-factor test shows this is private speech at issue.

In *Turner,* the court affirmed:

> In order to determine whether the speech in question is government or private speech, we consider: (1) the central "purpose" of the program in which the speech in question occurs; (2) the degree of "editorial control" exercised by the government or private entities over the content of the speech; (3) the identity of the "literal speaker"; and (4) whether the government or the private entity bears the "ultimate responsibility" for the content of the speech.

*Id.* at 354 (internal citations omitted).

Applying those factors, the Fourth Circuit concluded that the legislative prayer at issue in *Turner* was government speech. *Id.* However, the Recommendation fails to recognize that applying the same factors in the instant case yields a much different result.

### 1. First Factor

In its application of factor one, the Recommendation states, matter-of-factly: "Here, as in *Turner*, the central purpose of Board meetings is to conduct the business of government." (Rec. at 11.) But this analysis is too simplistic. While in *Turner* [and in *Wynne v. Town of Great Falls, S.C.*, 376 F.3d 292 (4th Cir. 2004), *cert. denied* 545 U.S. 1152 (2005), the first of the Fourth Circuit's three legislative prayer cases], an opening prayer was delivered only by city council members, as an agenda item and "an official part of every Council meeting" (*Turner*, 534 F.3d at 353-54)— in Forsyth County the invocation is delivered by guest religious leaders, before the meeting, and not as part of the agenda.

The Recommendation dismisses these features of the Forsyth County policy as mere "form over substance" (Rec. at 11, n.2), but they are important and deliberate distinctions. In fact, the challenged policy expressly states and makes clear precisely the opposite of what the Recommendation suggests. The policy begins (emphasis added):

> 1. In order to solemnize proceedings of the Forsyth County Board of Commissioners, it is the policy of the Board to allow for an invocation or prayer to be offered before its meetings for the benefit of the Board.
>
> 2. The prayer shall not be listed or recognized as an agenda item for the meeting **so that it may be clear the prayer is *not* considered a part of the public business.**
>
> 3. No member or employee of the Board or any other person in attendance at the meeting shall be required to participate in any prayer that is offered.

*See* Policy, ¶¶ 1-3 (Docket No. 65-2, p.5).

### 2. Second Factor

The Recommendation misstated and misapplied the second factor of the speech test as well. While the *Turner* Court summarized this factor as "the degree of 'editorial control' exercised by the government or private entities over the content of the speech," (*Id.* at 354), the Recommendation omitted the phrase "or private entities" from its summary of the test (Rec. at

Page 2

10). The omitted phrase is important, and again, the clear distinctions with *Turner* were overlooked.

In *Turner,* the court found it important that "the Council itself exercises substantial editorial control over the speech in question, as it has prohibited the giving of a sectarian prayer. While Turner is the literal speaker, he is allowed to speak only by virtue of his role as a Council member." *Id* at 354-55. In Forsyth County, the facts are *opposite*, in that the Board has shown it exercises zero editorial control over the invocations, which are provided by private citizens, by open invitation, on a voluntary, rotating basis.

The Recommendation acknowledges this by stating: "The Board's Policy prescribes that neither the Board nor its Clerk shall make prior inquiry into, review, or have involvement in the content of any prayer. (Docket No. 65, Ex. 1 ¶ 7.) Plaintiffs fail to show that Defendant has violated that provision and involved itself in the content of prayer delivered by local clergy." (Rec. at 11). However, the Recommendation then erroneously dismisses this <u>crucial fact</u> based on two inconsequential items: 1) that the Board chairperson delivered three (nonsectarian) invocations in the past (when a scheduled religious leader failed to show); and 2) that the Board's Clerk "plays a central role in **the process** which results in the [private] individuals' presence at Board meetings." *Id.* (emphasis added).

But these lesser facts should not have been dispositive. First, even when the Board chair delivered the three default invocations, she did so in her individual capacity, and still the Board engaged in no prior inquiry, review, or involvement in the content. Unlike in *Turner,* no policy of the Board dictated the content of what she might say (her decision to provide only a nonsectarian invocation, as she did, was entirely her own), and she was not "allowed to speak only by virtue of h[er] role as a Council [Board] member" as in *Turner* (Here, the written policy

Page 3

is silent on the matter of what occurs when a clergy member fails to show, and she merely stepped in spontaneously to fill the void. (Docket No. 76, p.7)). Regardless, this point has been moot since her invocation on May 12, 2008. As the Chair stated clearly in her non-refuted testimony, "I think I gave the prayer on two occasions, and we no longer do that. If we do not have someone from the community, then we just don't do that." (*Id.*)

Second, just because the Board Clerk mails out the annual invitations blindly to every religious leader in the county, and schedules the invocation speakers on a first-come, first-serve basis as they voluntarily respond and self-select for the duty, the Clerk's involvement in **the process** is very different than her exercising any "degree of 'editorial control'" over **the content** of what these private persons might say. Clearly, because the Board exercises—by design and in practice—absolutely no editorial control over the **content** of the invocations that are delivered by guest religious leaders, there is no doubt that the second factor of the speech test shows this is private speech. The Recommendation erred in finding otherwise.

### 3. Third Factor

Further, in its analysis, the Recommendation makes no application of the third factor of the Fourth Circuit's speech test at all. But that factor, "the identity of the 'literal speaker,'" is certainly important here, and is yet another glaring distinction between this case and *Turner*. It bears repeating that in *Turner* (as in *Wynne*), the City Council maintained a policy that specifically required opening prayers to be delivered *only* by Council members themselves, as an agenda item and "an official part of every Council meeting" (*Turner*, 534 F.3d at 353-54).

But in Forsyth County, the Board's policy provides **the opposite**: a pre-meeting invocation, delivered by guest religious leaders, and not as part of the agenda or public business. These are express, written provisions of the policy (*see* Docket No. 65-2, p.5). Accordingly,

Page 4

there is simply no question that the "literal speaker" in this case is a private citizen, and not the government entity itself The Recommendation should have addressed this third factor directly, and stated this obvious conclusion.

### 4. Fourth Factor

Finally, on factor four, in Forsyth County, the facts show unequivocally that the "'ultimate responsibility' for the **content** of the speech" at issue is that of the invocation speaker rather than the Board. The Recommendation missed this obvious fact as well. Instead, the Recommendation again compared *Turner* out of context. It noted, "the Fourth Circuit in *Turner* acknowledged that the speakers 'take some responsibility' for their prayers. *Id*, 534 F.3d at 355. Yet the court found that 'given the focus of the prayers on government business at the opening of the Council's meetings,' the prayers at issue were government speech. *Id*" (Rec. at 11).

But again, while that analysis may make sense in *Turner*— which reviewed the facts of a case in which "Council members are the only ones allowed to give the Call to Order[/prayer]," (*Turner*, 534 F.3d at 355)— it presents a crucial distinction with the facts at issue here. In Forsyth County, the Board's written policy expressly *disavows* any and all responsibility for the content of the speech. The policy clearly states, in relevant part:

> 7. Neither the Board nor the Clerk shall engage in any prior inquiry, review of, or involvement in, the content of any prayer to be offered by an invocational speaker.
>
> \* \* \*
>
> 9 This policy in not intended, and shall not be implemented or construed in any way, to affiliate the Board with, nor express the Board's preference for, any faith or religious denomination. Rather, this policy is intended to acknowledge and express the Board's respect for the diversity of religious denominations and faiths represented and practiced among the citizens of Forsyth County.

*See* Policy, ¶¶ 7, 9 (Docket No. 65-2, pp.6-7).

Importantly, as the Recommendation plainly acknowledges, "Plaintiffs fail to show that

Page 5

Defendant has violated that provision and involved itself in the content of prayer delivered by local clergy." (Rec. at 11). If this is true—and it certainly is—then the "'ultimate responsibility' for the content of the speech" at issue *has* to be that of the invocation speaker rather than the Board. Any other finding would defy logic and ignore the record facts.

## B. Consideration of the *Simpson* case does not change this analysis.

As shown above, a straightforward application of the Fourth Circuit's four-factor test for classifying speech clearly indicates that this unique case involves private speech in a designated public forum for such speech. Among its other errors is the fact that the Recommendation fails to acknowledge the Plaintiffs' important concession that, with its invocation policy, "[t]he Board provides the public forum ... for the clergy to pray." (Docket No. 64, Pls.' Brief in Support of Mot. for Summ. J., p.21). Neither *Turner*, nor any other previous Fourth Circuit case, dictates a different conclusion.

The Recommendation cites (at p. 12) only one other case as support for its finding of government speech, namely *Simpson v. Chesterfield County Bd. of Supervisors*, 404 F.3d 276, 288 (4th Cir. 2005). But *Simpson*, the second of the three legislative prayer cases in the Fourth Circuit [*Wynne, Simpson* and *Turner*], includes important distinctions from the present case as well. In *Simpson*, a county resident who practiced the Wiccan religion brought an action challenging the constitutionality of a Chesterfield County Board policy that—in a manner more restrictive than the policy at issue in Forsyth County—limited invited prayer-givers to representatives of *only* Judeo-Christian or monotheistic religions. *Id.* at 280, 284. Indeed, the district court specifically found that "those of non Judeo-Christian traditions are precluded from participating by the terms of the Board's policy." *Simpson v. Chesterfield Bd. of Supervisors*, 292 F.Supp.2d 805, 817 (E.D. Va. 2003).

Page 6

With regard to the matter of speech classification, the Fourth Circuit's decision in *Simpson* includes only three short paragraphs at the very end of the otherwise detailed opinion. *Id* at 288. There, the panel on appeal gave only passing approval of the magistrate judge's conclusion regarding the type of speech at issue. *Id* But a close review of the magistrate's analysis shows an important oversight, and key differences with the instant case.

First, the magistrate judge applied the **wrong test**. Instead of the required four-factor test, the magistrate utilized a mere two-part test, and reviewed only the "purpose and effect" of the speech at issue. *Simpson,* 292 F.Supp.2d at 819.[1] The judge was influenced by the fact that "[t]he context, and to a degree, the content of the invocation segment is governed by established guidelines by which the Board may regulate the content of what is or is not expressed when it 'enlists private entities to convey its own message.'" *Simpson,* 404 F.3d at 288 (quoting the magistrate judge, *Simpson,* 292 F.Supp.2d at 819 (quoting *Rosenberger,* 515 U.S. 819, 833 (1995)).

In this case, the facts, and thus the result, are very different. While the policy in *Simpson* was arguably discriminatory and permitted only its specifically preferred "adherents of 'the American civil religion' to participate in giving invocations," which was "interpreted and applied by the Board as referring *only* to the monotheistic faiths of the Judeo-Christian tradition," *Simpson,* 292 F.Supp.2d at 817 (emphasis in original), the opposite is true here. As shown in this record and summarized above, the Forsyth County Board literally opens its doors to *everyone,*[2]

---

[1] The "purpose and effect" analysis is the test provided by *Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971), for general Establishment Clause analysis. Analysis of a legislative prayer cases is governed instead by *Marsh v Chambers,* 463 U.S. 783 (1983).

[2] As the policy here shows on its face, and as the Board officials affirmed in their deposition testimony, there is no such Judeo-Christian or "monotheistic only" restriction at issue here. *See, e.g.,* the Board Chairperson (Docket No. 76, p.12):

and provides no similar restrictions, mandates, or editorial control over what the volunteer religious leaders may say. Here, it is each speaker's own, unfettered message that is being expressed, rather than the government "enlisting private entities to convey *its* message," as that distinction is explained in *Rosenberger*.[3]

Another key distinction between the *Simpson* case and the current case is the presence of a designated public forum. Here, it is **undisputed** that a public forum is at issue. While the Chesterfield Board argued that it did *not* intentionally or by its actions create a public forum for

---

*Q:* So if an established religious congregation of any sort in Forsyth County believed in more than one God, would they have an equal opportunity to provide the invocation as those who believe in only one God?
*A:* Yes.

*Q:* Is that a distinction you would have contemplated with this policy?
*A:* Absolutely not.

*See also, e.g.,* the Board Clerk, who has sole responsibility for sending the annual invitations to the area's "religious leaders" and scheduling the respondents on the first-come, first-serve basis (Docket No. 81-5, pp 7-8):

*Q:* In making the congregation [mailing] lists, both before the current policy and after its adoption, did you ever intentionally exclude any established religious congregation for any reason?
*A:* No.

*Q:* And so is it your testimony that you have tried, and those working with you have tried, to include everyone that you could find that was an established religious congregation in the county of Forsyth?
*A:* We have tried our very best.

Board officials further affirmed that diverse religious leaders have delivered the invocations, such as clergy from the Mormon, Jewish, Universalist, and Muslim faiths (Docket No. 81-5, p.8). In fact, a Muslim imam offered a prayer on May 14, 2007, the same night that the Board's written policy was formally enacted (Docket No. 76, p.10). Plaintiffs' counsel conceded at oral argument that "[O]ur contention is the County's prayer practice and policy hasn't changed... They just put in writing their policy..." Transcript of Summ. J. proceedings, p.7 (Attached Ex A).

[3] Importantly, *Rosenberger* actually affirms the Board's position in this case. There, the Supreme Court held that a university engaged in unconstitutional viewpoint discrimination by enforcing a policy that denied a student organization equal funding for printing costs of its newspaper publication because it was religious in nature. 515 U.S. at 819. The Court explained in its reasoning that the case was about "the principle that when the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. . . . It does not follow, however, . . . that viewpoint-based restrictions are proper when the University does not itself speak or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers. A holding that the University may not discriminate based on the viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles." 515 U.S. at 833-34 (internal citations omitted). Here, the Board has in similar fashion facilitated the speech of private persons in an unfettered way.

private speech (*Simpson,* 292 F.Supp.2d at 806)—your Defendant here specifically argues *the opposite.* Importantly, the Plaintiffs in this case do not refute, but rather, have *conceded* this point. (*See, e.g.,* Docket No. 64, Pls.' Brief in Support of Mot. for Summ. J., p.21 ("The Board provides the public forum ... for the clergy to pray."))

According to the district court in *Simpson,* "[i]f the invocation constitutes any type of forum, it must be viewed as a limited public forum" and thus analyzed in that way. *Simpson,* 292 F.Supp.2d at 820. The district court in *Simpson* suggested no forum was at issue there because the government program was "content-controlled," (*Id.* at 823), but it nevertheless hedged its bet and held in the alternative that if "the invocation segment constitutes a limited or designated public forum" then the Board's policy violated the Wiccan plaintiff's free speech rights because she the Board engaged in viewpoint discrimination by denying her request to offer a prayer. *Id.* at 822.

The case at bar is easily distinguished from those circumstances. Not only is it an *undisputed* fact here that a public forum has been created, Defendant has shown there is zero "content-control" at issue. Unlike in *Simpson,* guest invocation speakers here are permitted and are "free to offer the invocation according to the dictates of [their] own conscience." (*See* Policy, Docket No. 65-2, p.6). As affirmed by the Recommendation, "[t]he Board's Policy prescribes that neither the Board nor its Clerk shall make prior inquiry into, review, or have involvement in the content of any prayer[, and] Plaintiffs fail to show that Defendant has violated that provision and involved itself in the content of prayer delivered by local clergy." (Rec. at 11). Moreover, unlike the Wiccan plaintiff in *Simpson,* the Plaintiffs in the present case have never made any claim or allegation of viewpoint discrimination or exclusion from the forum. Indeed, unlike the Wiccan plaintiff in *Simpson,* the Plaintiffs here never asked to be included in the invocation

Page 9

invitation list, nor claimed eligibility for the same as local religious leaders. In this case, the Policy's limitation of eligible invocation speakers to the "religious leaders" of any and all "established religious congregations in Forsyth County" (*See* Policy, Docket No. 65-2, p.5), is clearly viewpoint neutral and unquestionably reasonable and constitutional.

### C. There can be no argument that the four-factor test has been abrogated.

While neither the district nor appellate courts in *Simpson* made any mention of the four-factor test, *Turner,* decided by the Fourth Circuit three years later, clearly affirmed (or reaffirmed) the four-factor as the appropriate and applicable test to determine "whether the speech in question is government or private speech." *Turner,* 534 F.3d at 354. Since *Turner* is the latest pronouncement on the issue in this circuit, it clearly applies. As discussed above, unlike the application of the test in that case (Council members-only, delivering formal agenda/public business prayers), the facts of this unique, first-of-its-kind case dictate a very different result. Clearly, under both the letter and spirit of the Fourth Circuit's four-factor test, the speech at issue here is private in nature. The Recommendation errs in suggesting the opposite.

## II. THE RECOMMENDATION FAILS TO ACKNOWLEDGE THAT SPEECH ANALYSIS WAS UNECESSARY TO BEGIN WITH.

Defendant respectfully objects to the Recommendation finding that speech analysis was necessary here in the first place. All agree that the case is governed by the seminal ruling, *Marsh v. Chambers,* 463 U.S. 783 (1983), and its progeny. In *Marsh,* the Supreme Court held that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country" and clearly constitutional. *Id.* at 796. The Court further clarified, "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or

advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." *Id.* at 794-795.

It is important to note that the Supreme Court in *Marsh* engaged in no analysis of whether the speech in question was government or private speech. Similarly, the Fourth Circuit in *Wynne* engaged in no such analysis. The reason is because the analysis was unnecessary in those cases, which, **like the present case**, involved no allegations of viewpoint discrimination by an individual claiming he was himself barred from speaking in a designated forum for speech (prayer). In other words, *Marsh* and *Wynne*, like the case at bar, were merely Establishment Clause cases.

On the other hand, the government vs. private speech analysis *was* necessitated in the cases of *Simpson* and *Turner*, because **unlike the present case**, the plaintiffs in both *Simpson* and *Turner* alleged the challenged policies excluded them from speaking/expressing their own preferred religious viewpoint. *See, e.g., Simpson,* 404 F.3d at 280 (Plaintiff "alleged that her exclusion from the list amounted to a violation of the Establishment Clause ... [and] her rights under the Free Exercise and Free Speech Clauses [ ], as well as Equal Protection."); *Turner,* 534 F.3d at 354 ("Turner filed this suit, claiming that the Council's prayer policy was an unconstitutional establishment of religion, and that it violated his Free Exercise and Free Speech rights.") In other words, because *Simpson* and *Turner* involved Free Exercise and Free Speech claims (in addition to Establishment Clause claims), there was a reason to evaluate what *type* of speech was at issue. There can obviously be no violation of Free Exercise and Free Speech rights if there is no private speech opportunity.[4]

---

[4] *See, e.g., Turner,* 534 F.3d at 356: "Appellant also argues that the prayer policy violates his Free Exercise and First Amendment rights. As *Simpson* explained: '[T]his issue turns on the characterization of the invocation as government speech ... [The invocation is not] intended for the exercise of one's religion. . The context and to a degree, the content, of the invocation segment is governed by established guidelines by which the [government] may

## III. THE RECOMMENDATION ERRS BY PLACING UNDUE EMPHASIS ON THE CONTENT OF SPECIFIC INVOCATIONS.

In a straightforward Establishment Clause case concerning legislative prayer, like *Marsh, Wynne,* and the present action, the Supreme Court has made clear that, "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer." *Marsh,* 463 U.S. at 794-795. Defendant respectfully objects that the Recommendation has deviated from this standard.

This Fourth Circuit has seemingly made this rule of thumb clear. "If *Marsh* means anything, it is clear that the Establishment Clause does not scrutinize legislative invocations with the same rigor that it appraises other religious activities." *Simpson,* 404 F.3d at 287. Even in *Turner,* which involved prayers delivered exclusively by government officials, the Fourth Circuit explained, "We need not decide whether the Establishment Clause *compelled* the Council to adopt their [nonsectarian only] legislative prayer policy, because **the Establishment Clause does not absolutely dictate the form of legislative prayer.**" *Turner,* 534 F.3d 352 (italics in original, bold added here). Interestingly, the Recommendation errs by neglecting entirely to apply *Turner*—the most recent Fourth Circuit case on point—to the merits of the key legal issue here: the Establishment Clause question. In fact, the Recommendation curiously fails to even mention *Turner* in its six pages of Establishment Clause analysis (Rec. at pp 12-18).

## IV. THE RECOMMENDATION ERRS BY FINDING THAT ALL SECTARIAN REFERENCES ARE BARRED BY THIS CIRCUIT.

---

regulate the content of what is not expressed.' *Simpson,* 404 F.3d at 288 (internal citations omitted)...; *see also Rosenberger,* 515 U.S. 819, 833 ('[W]e have permitted the government to regulate the content of what is or is not expressed when it is the speaker.') Turner was given the chance to pray on behalf of the government [as an elected official, as part of the meeting agenda]."

Page 12

Defendant respectfully objects to the Recommendation finding that sectarian references are inherently unconstitutional. This is an overly simplistic approach that ignores the instruction of the Supreme Court in *Marsh,* and the Fourth Circuit in *Turner,* as well as the findings of the other federal courts nationwide. As noted below, according to those latter authorities, *no appellate circuit has mandated only nonsectarian prayer—including the Fourth Circuit.*

A.     **The finding that all sectarian references are barred ignores the instruction of the Supreme Court.**

The Supreme Court has never commanded removal of sectarian references from public prayer, because the practice is constitutional—particularly where different persons of varying creeds take turns offering the invocations. In *Marsh,* the Court upheld the Nebraska legislature's prayer policy despite the facts that: a clergyman of only one denomination (Presbyterian) was selected for 16 consecutive years; the chaplain was paid at public expense; and the prayers were in the Judeo-Christian tradition. *Marsh,* 463 U.S. at 793. While footnote (*Id,* n.14) states that the chaplain voluntarily removed all direct sectarian references after a certain point, that self-censorship was not indicated by the Court to a necessity, nor a primary reason for the Court's overall decision. The majority in *Marsh* did not actually provide any comment on the nonsectarian content of Nebraska chaplain's prayers, nor attribute any significance to the chaplain's voluntary decision to self-censor his content.[5] Rather, the *Marsh* Court specifically reviewed centuries of prayers that *did* mention sectarian deities and beliefs,[6] and favorably cited

_____

[5] The characterization of the prayers as "nonsectarian," "Judeo Christian," and having "elements of the American civil religion" were descriptions provided by the chaplain himself, rather than the Court. *Marsh,* 463 U.S. at 793 n. 14. This footnote referring the actual text of the prayers relates only to the plaintiff's argument that prayers "in the Judeo-Christian tradition" should be declared unconstitutional. The Supreme Court explicitly rejected that argument. *Id* at 793-95.

[6] *E.g.,* the dissent in *Marsh* noted the Court's review of overtly sectarian prayers in various state legislatures, including Massachusetts and Kansas. *Marsh,* 463 U.S. at 818, n. 38. Moreover, as Chief Justice Rehnquist re-

Page 13

to the traditions of the Congress. To this day, prayers offered before Congress often contain explicit sectarian (and, incidentally, most often specifically Christian) references.[7]

Instead of proscribing any and all sectarian references, the plain language of *Marsh* sets forth the opposite proposition and clear standard for lower courts: "The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Id* at 794-795

**B.      The finding that all sectarian references are barred ignores the instruction of the Fourth Circuit.**

While it may be recognized as a legal *safe harbor* for a legislative body to enact a "nondenominational" prayer policy ("squarely within the range of conduct permitted by *Marsh* and *Simpson*," (*Turner*, 534 F.3d at 356))—a truly open policy that allows for uncensored invocations by a wide pool of invited guests <u>can</u> still be constitutional in the Fourth Circuit because we know "the Establishment Clause does *not* absolutely dictate the form of legislative prayer." *Id.* (emphasis added). This is assertion is consistent with *Wynne* and *Simpson,* which acknowledged, "the [*Marsh*] Court stated that a practice would remain constitutionally unremarkable where 'there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief.'" *Simpson,* 404 F.3d at 283 (*quoting Marsh,* 463 U.S. at 794-95).

---

counted 22 years later, "In *Marsh,* the prayers were often explicitly Christian . . . " *Van Orden v. Perry,* 545 U.S. 677, 688 n.8 (2005) (Rehnquist, C.J., plurality) (citing *Marsh,* 463 U.S. at 793-94 n. 14)

[7] *See, e.g., Newdow v. Bush,* 355 F.Supp.2d 265, 285 n. 23 (D.D.C 2005) (acknowledging that "the legislative prayers at the U.S. Congress are overtly sectarian"); S. Epstein, *Rethinking the Constitutionality of Ceremonial Deism,* 96 COLUM. L. REV. 2083, 2104 at n 118 (1996) (noting that, from 1989 to 1996, "over two hundred and fifty opening prayers delivered by congressional chaplains [ ] included supplications to Jesus Christ")

## 1. The Recommendation fails to distinguish the key facts of the three previous Fourth Circuit cases.

The previous Fourth Circuit cases are misapplied by the recommendation. For example, at pp. 14-15, the Recommendation discusses and applies *Wynne*, but fails to acknowledge why the outrageous circumstances presented there have almost *nothing* in common with the specific facts at issue here. In *Wynne*, a small town council clearly crossed the constitutional line and unquestionably *exploited* its prayer opportunity when it: "steadfastly refused" to invoke any "deity associated with any specific faith other than Christianity" (370 F.3d at 300, n.5); intentionally "advance[d] its own religious views in preference to all others" (*Id.* at 302); and had council members publicly denigrate and "ostracize" those who refused to participate in their prayers (*Id.* at 298).[8] Importantly, the town council followed a practice whereby *council members themselves* delivered the prayers. *Id.* at 294.

The Recommendation points out that the *Wynne* court relied upon dicta in *Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573 (1989), in applying *Marsh*. The Recommendation states (at p.15):

> The *Wynne* court construed *Allegheny* to have clarified that the prayer in *Marsh* was upheld only because the chaplain had removed all references to Christ. [citing *Wynne*] at 299. Thus the prayer did not violate the 'nonsectarian maxim' that the Establishment Clause at least means neither a state nor the federal government can prefer one religion over another. *Id.* Invocations that have the 'effect of affiliating the government with any one specific faith or belief' do not 'fall within' the category of legislative prayer discussed in *Marsh*. *Id.* (internal citations omitted).

---

[8] There are other important distinctions as well, including but not limited to the facts that the town council in *Wynne* made its prayers an official agenda item and "part of the public business" (*Id.* at 301); openly declared its intent that "the Town's prayers are not just for the council members but for all of the Town's citizens," and thus prayers were "directed at" the citizenry (*Id.* at 301, n.7). As noted herein above, the Forsyth County policy provides for the opposite.

But this is not a precise quote from *Wynne*, as it leaves out the *Allegheny* Court's important descriptive word "particular" in the phrase, "because the **particular** chaplain had removed all references to Christ." That distinction is crucial to a logical understanding of the case law. In *Marsh,* the Supreme Court affirmed: "We granted certiorari limited to the challenge to the practice of opening sessions with prayers by a State-employed clergyman." *Marsh,* 463 U.S. at 786. **And this is the key:** If *only one*, government-paid chaplain delivers every prayer (as in *Marsh*), or if the prayers are delivered *only by* government officials (as in *Wynne* and *Turner*), there is an obvious and inherent risk that the invocations may have the "effect of affiliating the government with [ ] one specific faith or belief" or may tend to show "the government's allegiance to a particular sect or creed." *Wynne,* 376 F.3d at 299 (quoting *Allegheny,* 492 U.S. at 603). On the other hand—as in a case like the one at bar—if invocations are allowed by a wide pool of volunteer, self-selected citizens, in a designated public forum for such private speech, prior to a public meeting and not as an official agenda item—there is no such risk that the invocations may have the "effect of affiliating the government with [ ] one specific faith or belief" or may tend to show "the government's allegiance to a particular sect or creed."

The *Simpson* case differs in this important way. While the county board there utilized a wide pool of clergy as its guest invocation speakers, the board specifically denied the intention to create an open forum (*Simpson,* 292 F.Supp.2d at 806), but rather maintained "content-control" over what was said by the guests (*Id.* at 823), mandating, in part, that the prayers could *only* be from delivered by representatives of Judeo-Christian or monotheistic religions. *Simpson,* 404 F.3d at 280, 284. In those particular circumstances, *unlike* the case at bar, there is a again an inherent risk that the invocations may have the "effect of affiliating the government with [ ] one

specific faith or belief" or may tend to show "the government's allegiance to a particular sect or creed." Accordingly, it makes sense that the Fourth Circuit would expect "a divine appeal [that is] wide-ranging, tying its legitimacy to common religious ground," and invocations that should "transcend denominational boundaries," and "highlight beliefs widely held," etc., as articulated—but incorrectly distinguished and applied—by the Recommendation (at p.15).

It is because of this failure to distinguish and apply the above cases that the Recommendation then incorrectly finds (at p. 16) that the sectarian references by guest invocation speakers in this case "display a preference for Christianity over other religions by the government" and "affiliate the Board with a specific faith or belief." The record shows precisely the opposite. Not only is the annual invitation letter sent blindly, addressed to the "religious leader" of literally every religious congregation of every tradition in the county (*see, e.g.*, Rec. Doc. 81-6, p.3), the letter includes this important admonition to the invited clergy (emphasis added here):

> This opportunity is voluntary, and you are free to offer the invocation according to the dictates of your own conscience. *To maintain a spirit of respect and ecumenism, the Board requests only that the prayer opportunity not be exploited as an effort to convert others to the particular faith of the invocational speaker, nor to disparage any faith or belief different than that of the invocational speaker.*

Rec. Doc. 81-3, p. 8.

In litigation involving the Establishment Clause, facts are particularly important and must be reviewed and considered carefully.[9] Even a slight distinction in the records of two apparently

---

[9] *See, e.g., Lynch v. Donnelly*, 465 U.S. 668, 678 (1984) (internal citations omitted): "In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court. Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith—as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so."

similar cases can dictate a different outcome for each.[10] As the Supreme Court has made clear, "[o]ur Establishment Clause jurisprudence remains a delicate and fact-sensitive one." *Lee v. Weisman*, 505 U.S. 577, 597 (1992)) "[T]he inquiry calls for line-drawing; no fixed, *per se* rule can be framed." *Lynch*, 465 U.S. at 678. This "'delicate and fact-sensitive' inquiry is evident in the area of legislative prayer, which the Supreme Court, in *Marsh*, excepted from the traditional analysis under the Establishment Clause." *Pelphrey v. Cobb County*, 547 F.3d 1263, 1269 (11th Cir. 2008) (citing *Lee v. Weisman*, 505 U.S. 577, 597 (1992)).

### C.   The finding that all sectarian references are barred ignores the instruction of the other federal courts.

Challenges to sectarian invocations are a new phenomenon,[11] and the courts have thus far declined these extraordinary requests to impose a blanket censor upon prayer content. As was just summarized by the Eleventh Circuit in *Pelphrey*:

> The taxpayers erroneously contend that several other circuits have read *Marsh* to permit only nonsectarian prayer. A review of the precedents of our sister circuits establishes that they have *not* reached a consensus on the permissibility of sectarian references in legislative prayers. Two of the circuits [**the Fourth Circuit** and the Tenth Circuit] read *Marsh* as we do. The remaining four circuits have not reached a decision about sectarian references in legislative prayers.

*Pelphrey*, 547 F.3d at 1272 (emphasis added).[12]

---

[10] *Compare, e.g., McCreary County v. ACLU*, 545 U.S. 844 (2005) and *Van Orden v. Perry*, 545 U.S. 677 (2005). The issue in both cases was whether a Ten Commandments display violated the Establishment Clause. However, on the same day, due to differences in the specific facts of each record, the Court upheld the display in *Van Orden* (545 U.S. 692) but struck down the display in *McCreary* (545 U.S. at 881).

[11] "There had been virtually no litigation or legal authority concerning the constitutionality of sectarian legislative prayer until the last six years." R. Luther III & D. Caddell, *Breaking Away from the "Prayer Police" Why the First Amendment Permits Sectarian Legislative Prayer and Demands a "Practice Focused" Analysis*, 48 SANTA CLARA L. REV. 569, 571 (2008).

[12] "[Like the Fourth Circuit,] [t]he Tenth Circuit also has stated that *Marsh* does not categorically prohibit prayers that invoke 'particular concept[s] of God.' *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1233-34, 1234 n. 10 (10th Cir.1998) (en banc). . . Contrary to the taxpayers' argument, the Fifth Circuit, the Seventh Circuit, and the Ninth Circuit have not decided the constitutionality of sectarian references in legislative prayers." *Pelphrey* at 1273-74.

The opinion continues, "The Fourth Circuit has not read *Marsh* to bar legislative prayers that contain a variety of religious expressions," and then provides a detailed review of the analysis and holdings in *Wynne,* and the distinctions in *Simpson,* in which "the Fourth Circuit read *Marsh,* as we do, to allow a county to invite clergy from diverse faiths to offer 'a wide variety of prayers' at meetings of its governing body." *Pelphrey,* 547 F.3d at 1272-73 (quoting *Simpson,* 404 F.3d at 284). The Eleventh Circuit agreed with the *Simpson* Court that "a practice would remain constitutionally unremarkable" where there is no evidence of exploitation—even when the *Simpson* case record acknowledged usage of terms such as " 'Lord God, our creator,' 'giver and sustainer of life,' 'the God of Abraham, Isaac and Jacob,' 'the God of Abraham, of Moses, Jesus, and Mohammad,' 'Heavenly Father,' 'Lord our Governor,' 'mighty God,' 'Lord of Lords, King of Kings, creator of planet Earth and the universe and our own creator.' " *Id*

Like in the case at bar, the plaintiffs in *Pelphrey* challenged an invocation policy that allowed for a rotating body of visiting clergy to offer a prayer before county commission meetings. The court found no merit in the plaintiffs' legal arguments, and, because of the context of the invocations, was unconcerned that the vast majority of the prayers happened to be Christian in nature. *Id.* at 1277. The court determined:

> The taxpayers argue that *Allegheny* requires us to read *Marsh* narrowly to permit only nonsectarian prayer, **but they are wrong.** *Allegheny* does not require that legislative prayer conform to the model in *Marsh. Allegheny* instead reiterates the lesson of *Marsh* that legislative prayers should not "demonstrate a [government] preference for one particular sect or creed ...." *See Allegheny,* 492 U.S. at 605, 109 S.Ct. at 3107. When legislative prayers do not "have the effect of affiliating the government with any one specific faith or belief," *id* at 603, 109 S.Ct. at 3106 (citation omitted), "it is not for [the court] to embark on a sensitive evaluation or to parse the content of a particular prayer." *Marsh,* 463 U.S. at 795, 103 S.Ct. at 3338.

*Pelphrey,* 547 F.3d at 1271-72 (bold typeface added).

The most recent federal court to review this issue, *John Doe #2, et al. v. Tangipahoa Parish School Board, et al.*, 631 F.Supp.2d 823 (E.D. La., June 24, 2009), upheld a prayer policy (almost identical to Forsyth County's, allowing for uncensored invocations) as facially constitutional:

> **The Fourth Circuit** has stopped short of holding that *Marsh* commands that legislative prayer must be nonsectarian. [Citing *Turner, Wynne* and *Simpson* cases.] The Tenth Circuit, like the Fourth, also focuses on whether the prayer opportunity has been exploited, but has concluded that Marsh does not prohibit prayers that invoke "particular concept[s] of God." [Quoting *Snyder*]

631 F.Supp.2d at 836-37 (emphasis added)

## CONCLUSION

Plaintiffs here can produce no evidence that the Board crossed any constitutional line with its invocations practice. Instead, as noted above, its carefully drafted and followed Policy offers a virtual *gold standard* of neutrality and inclusion. By design and in actual practice, it expressly opens the door for participation of every organized religion in the county, on an equal and rotating basis, and shows neither favoritism nor hostility to any. It has included, *by design*, an array of religious leaders from diverse backgrounds and perspectives, such as leaders of the Jewish faith, the Muslim faith, the Mormon faith, the Unitarian Universalists, Scientologists, Moravians, Baptists, Methodists, Quakers, Wesleyans, Presbyterians, Seventh Day Adventists, African Methodist Episcopalians, Lutherans, Nazarenes, Independents, and numerous other denominations and non-denominations. (*E.g.*, Docket No. 80, p.5.) Clearly, the prayer opportunity has not been "exploited" here in any way, and there is not a scintilla of evidence to suggest otherwise. The Recommendation errs in finding an Establishment Clause violation and allowing injunction and the recovery of nominal damages and fees. Instead, the Defendants were entitled summary judgment, and the Recommendation should thus be rejected.

Page 20

Respectfully submitted, this 27th day of November, 2009.

ATTORNEYS FOR DEFENDANT

/s/ J. Michael Johnson
J. Michael Johnson
Senior Legal Counsel
Alliance Defense Fund
Lead Counsel for Defendant
P.O. Box 52954
Shreveport, Louisiana 71135
Phone: (318) 603-1435
Email: mjohnson@telladf.org
Licensed to practice in LA


David A. Cortman*
Senior Legal Counsel
Alliance Defense Fund
Counsel for Defendant
1000 Hurricane Shoals Rd. D-600
Lawrenceville, GA 30043
Phone: (770) 339-0774
Email: dcortman@telladf.org
Licensed to practice in FL and GA

Bryce D. Neier
Local NC Counsel
Allied Attorney with ADF
The Law Office of Bryce D. Neier
P.O. Box 87164
Fayetteville, NC 28304
Phone: (910) 423-5000
Email: bryceneier@aol.com
NC State Bar No. 19206

David Gibbs*
Barbara Weller*
The Gibbs Law Firm
Counsel for Defendant
5666 Seminole Blvd., Suite 2
Seminole, FL 33772
Phone: 727-399-8300
Email: dgibbs@gibbsfirm.com
 bweller@gibbsfirm.com
Gibbs licensed to practice in FL, ND,
MN, CO, TX, OH and Dist. of Columbia
         Weller licensed to practice in FL


* By special appearance pursuant to LR 83.1(d)

Page 21

## CERTIFICATE OF SERVICE

I hereby certify that on November 27, 2009, I electronically filed the foregoing with accompanying exhibit, with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all attorneys of record herein, including the Attorney for Plaintiffs, Ms. Katherine Lewis Parker, by electronic mail to acluncklp@nc.rr.com.

Respectfully submitted,

/s/ J. Michael Johnson
J. Michael Johnson
Senior Legal Counsel
Alliance Defense Fund
Lead Counsel for Defendant
P.O. Box 52954
Shreveport, Louisiana 71135
Phone: (318) 603-1435
Email: mjohnson@telladf.org
Licensed to practice in LA

EXHIBIT A

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3   JANET JOYNER, et al,              Civil Action
                                      No. 1:07CV243
4        Plaintiff,

5   vs.                              Greensboro, North Carolina
                                     October 14, 2009
6   FORSYTH COUNTY, NORTH CAROLINA,  10:30 a.m.

7        Defendant.
    _____/

8

9               TRANSCRIPT OF PROCEEDINGS

10      BEFORE THE HONORABLE P. TREVOR SHARP

11           UNITED STATES MAGISTRATE JUDGE

12  APPEARANCES:

13  For the Plaintiff:     KATHERINE LEWIS PARKER, ESQUIRE
                           American Civil Liberties Union
14                         of North Carolina
                           Post Office Box 28004
15                         Raleigh, North Carolina 27611-8004

16

    For the Defendant:     J. MICHAEL JOHNSON, ESQUIRE
17                         Alliance Defense Fund
                           Post Office Box 52954
18                         Shreveport, Louisiana 71135
            and
19                         BRYCE D. NEIER, ESQUIRE
                           Post Office Box 87164
20                         Fayetteville, North Carolina 28304

21  Court Reporter:        J. Calhoun, RPR
                           Room 101, U.S. Courthouse Building
22                         324 West Market Street
                           Greensboro, North Carolina 27401
23                         (336) 332-6033

24

25       Proceedings reported by stenotype reporter.
       Transcript produced by computer-aided transcription.

1    are relevant.

2           I think that as far as the judge's ruling, it is

3    sufficient to rule on the prayers after the policy is enacted,

4    although it is important to look at the prayers before, because

5    our contention is, the County's prayer practice and policy

6    hasn't changed, Your Honor.  They just put into writing  their

7    policy of sponsoring sectarian prayer before the policy, so all

8    the policy did was, put into writing the fact that they --

9           THE COURT:  Let me remember.  Before the policy, did

10   they send a letter out to religious leaders or was that new with

11   the policy?

12          MS. PARKER:  They did send out letters to religious

13   leaders

14          THE COURT:  Let me ask you also, you indicated that

15   you say 80 percent of the prayers are sectarian.  Are all of the

16   prayers from May 2007 forward to some point fairly

17   contemporaneous to today in the record?

18          MS. PARKER:  The prayers are in the record up until

19   the time that the lawsuit was amended in January of '08, Your

20   Honor.

21          THE COURT:  And so your statistics, 80 percent, are

22   limited to prayers between May 2007 and January 2008?

23          MS. PARKER:  That's correct, Your Honor.

24          THE COURT:  By a sectarian prayer, for example, you

25   consider one reference to Jesus Christ, perhaps in the closing

1   or in the opening, that is sufficient to make it a sectarian

2   prayer, in your argument?

3           MS. PARKER: That is correct, Your Honor, and we

4   believe the Fourth Circuit agrees with that.

5           THE COURT: How many of these prayers do you consider

6   to go beyond advancement to proselytizing? You mentioned one.

7           MS. PARKER: At least that one, Your Honor, and --

8   that may be the only one that goes that far to proselytization,

9   but as I'll talk about the law, you know, the *Wynne* case -- the

10  Fourth Circuit in *Wynne* talks about advancement or

11  proselytization is the key for determining whether a government

12  is sponsoring prayer in violation of the Establishment Clause.

13  So even if it just shows advancing, having the effect of

14  affiliating the government with one religion over the other, it

15  is still sufficient to violate the Establishment Clause.

16          THE COURT: Did your discovery go beyond January of

17  '08? Do you have the prayers since that time?

18          MS. PARKER: We do not have them in the record, Your

19  Honor. We certainly could get them and amend the record, if

20  that was something that Your Honor would like.

21          THE COURT: All right. Continue with the argument,

22  please.

23          MS. PARKER: Okay.

24          So as we started to talk about, Your Honor, the main

25  case in this issue, in this area, as Your Honor is aware, is